UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CECILE J. DEBEAULIEU | : | |
| | : | |
| v. | : | C.A. No. 07-423A |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of the Social Security | : | |
| Administration | : | |

**MEMORANDUM AND ORDER**

This matter is before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Supplemental Security Income ("SSI") benefits and Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"), 42 U.S.C. § 405(g). Plaintiff filed her Complaint on November 19, 2007 seeking to reverse the decision of the Commissioner. On June 20, 2008, Plaintiff filed a Motion to Reverse the Decision of the Commissioner. (Document No. 10). On July 14, 2008, the Commissioner filed a Motion for Order Affirming the Decision of the Commissioner. (Document No. 11).

With the consent of the parties, this case has been referred to me for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Based upon my review of the record and the legal memoranda filed by the parties, I find that there is substantial evidence in the record to support the Commissioner's decision and findings that Plaintiff is not disabled within the meaning of the Act. Consequently, I order that the Commissioner's Motion for Order Affirming the Decision of the Commissioner (Document No. 11) be GRANTED and that Plaintiff's Motion to Reverse the Decision of the Commissioner (Document No. 10) be DENIED.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB on December 29, 2004, (Tr. 86-88) and an application for SSI alleging disability as of September 11, 2000. Plaintiff was insured for DIB only through September 30, 2005. (Tr. 14, 68). The applications were denied initially (Tr. 77-80) and on reconsideration. (Tr. 73-75). Plaintiff filed a request for an administrative hearing. (Tr. 72). On February 28, 2007, a hearing was held before Administrative Law Judge Barry H. Best (the "ALJ") at which Plaintiff, represented by counsel, and a vocational expert appeared and testified. (Tr. 34-67).

On August 29, 2007, the ALJ issued a decision finding that Plaintiff was not disabled. (Tr. 9-23). The Appeals Council denied Plaintiff's request for review on September 28, 2007. (Tr. 5-8). A timely appeal was then filed with this Court.

## II. THE PARTIES' POSITIONS

Plaintiff argues that the ALJ erred in giving reduced weight to the opinions of Plaintiff's treating orthopedic surgeon. Plaintiff also argues that the ALJ's mental finding are not adequately supported.

The Commissioner disputes Plaintiff's claims and asserts that there is substantial evidence which supports the ALJ's assessment of Plaintiff's physical and mental RFC.

## III. THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health

and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Where the Commissioner's decision is supported by substantial evidence, the court must affirm, even if the court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991). The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

The court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) citing, Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985).

The court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. Seavey, 276 F.3d at 8. To remand under sentence four, the court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Id.; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980)

(remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the court cannot discern the basis for the Commissioner's decision, a sentence four remand may be appropriate to allow her to explain the basis for her decision. Freeman v. Barnhart, 274 F.3d 606, 609-610 (1st Cir. 2001). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a sentence four remand, the court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court...may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level. See Jackson v. Chater, 99 F.3d 1086, 1090-1092 (11th Cir. 1996).

A sentence six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095. With a sentence six remand, the parties must return to the court after remand to file modified

findings of fact. Id. The court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. Id.

## IV. DISABILITY DETERMINATION

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

### A. Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275-276 (1st Cir. 1988).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a

treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(e). See also Dudley v. Sec'y of Health and Human Servs., 816 F.2d 792, 794 (1st Cir. 1987).

**B. Developing the Record**

The ALJ has a duty to fully and fairly develop the record. Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right if counsel is not retained. See 42 U.S.C. § 406; Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 142 (1st Cir. 1987). The obligation to fully and fairly develop the record exists

if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. Id. However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. See Heggarty, 947 F.2d at 997, citing Currier v. Sec'y of Health Educ. and Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

### C. Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; see also Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. Carrillo Marin v. Sec'y of Health and Human Servs., 758 F.2d 14, 17 (1st Cir. 1985).

### D. The Five-step Evaluation

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth,

if a claimant's impairments (considering her RFC, age, education and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f). Significantly, the claimant bears the burden of proof at steps one through four, but the Commissioner bears the burden at step five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five-step process applies to both SSDI and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant bears the ultimate burden of proving the existence of a disability as defined by the Social Security Act. Seavey, 276 F.3d at 5. The claimant must prove disability on or before the last day of her insured status for the purposes of disability benefits. Deblois v. Sec'y of Health and Human Servs., 686 F.2d 76 (1st Cir. 1982), 42 U.S.C. §§ 416(I)(3), 423(a), (c). If a claimant becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability. Id.

**E. Other Work**

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. Seavey, 276 F.3d at 5. In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a

claimant. Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines (the "grids"). Seavey, 276 F.3d at 5. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. Id.; see also Heckler v. Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills. Nguyen, 172 F.3d at 36. In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. Heggarty, 947 F.2d at 996. It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.

**1. Pain**

"Pain can constitute a significant non-exertional impairment." Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42

U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

> (1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> (2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
>
> (3) Type, dosage, effectiveness, and adverse side-effects of any pain medication;
>
> (4) Treatment, other than medication, for relief of pain;
>
> (5) Functional restrictions; and
>
> (6) The claimant's daily activities.

Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986). An individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

**2. Credibility**

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Rohrberg, 26 F. Supp. 2d at 309. A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. See Frustaglia, 829 F.2d at 195. The failure to articulate the reasons for discrediting subjective pain testimony requires

that the testimony be accepted as true. See DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24 (1st Cir. 1986).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

## V. APPLICATION AND ANALYSIS

Plaintiff was fifty years old at the time of the ALJ hearing. (Tr. 38, 86). She has an eleventh-grade education with past relevant work as a braider, stock person and floor person. (Tr. 55-57, 94, 99). Plaintiff ceased full-time employment in 2000 and has not worked since except for three very brief stints in 2001 and 2004. (Tr. 39, 84, 90). Plaintiff initially alleged disability due to arthritis, high blood pressure and diabetes. (Tr. 89). Plaintiff additionally alleged problems with her feet, hip, and knee, depression and bilateral carpal tunnel syndrome. (Tr. 40, 45-46).

An MRI of Plaintiff's cervical spine performed on October 6, 2003 revealed degenerative changes with disc osteophye complexes and neural foraminal narrowing. (Tr. 139). There was no evidence of disc hemiation. Id.

Plaintiff was referred by the state disability determination service ("DDS") to consultative psychologist Dr. James Curran for a psychological evaluation on June 1, 2005. (Tr. 181-184). Plaintiff stated that she quit school in the eleventh grade because she did not like school; she had been in regular education classes and did not obtain her general equivalency diploma. (Tr. 181).

Her parents divorced when she was six years old, and she "very seldom saw her father after that." Id. Her mother was physically abusive towards her while she was growing up. Id. Though she had never been a victim of sexual abuse,[1] she reported physical abuse by three former husbands. (Tr. 181-182). She had never been psychiatrically hospitalized and had never been in counseling or psychotherapy. (Tr. 182). She had been depressed for about two years. Id. She reported symptoms of both depression and post-traumatic stress disorder ("PTSD"). Id. She was married three times and had one child who died as an infant and has four adult children who live close by (one lived with Plaintiff at that time) and were supportive of her. (Tr. 182-183).

On mental status examination, Plaintiff's speech was within normal limits. (Tr. 183). Though she appeared depressed, there was no evidence of a thought disorder, and she denied hallucinations and delusions. Id. Her insight and judgment were fair. Id. Dr. Curran diagnosed major depressive disorder, recurrent, moderate and PTSD, moderate, as well as a simple phobia of heights. (Tr. 184). He placed her Global Assessment of Functioning ("GAF") score at 55. Id. Dr. Curran further stated that Plaintiff could follow simple instructions at work, and could get along with peers and supervisors; by her own report, Plaintiff's medical problems were the main cause of her reported inability to work "although she is somewhat depressed." Id.

Dr. David Stoll, a DDS consultant physician, performed a physical examination of Plaintiff on November 28, 2005. (Tr. 218-220). Plaintiff reported progressive left hip pain over the past two years or so. (Tr. 218). She indicated she could only sit or stand for fifteen minutes at a time, could only walk three quarters of a mile and was only "truly" comfortable when flat on her back. Id. She got on and off the examination table and moved around the office with "evidence of difficulty." (Tr.

[1] In subsequent records, Plaintiff reported childhood sexual abuse by her stepfather. (Tr. 218, 232).

219). She had a pronounced limp and was "obviously in pain." Id. She had obvious and distinct limitation of motion in her left hip. Id. Examination of both knee joints was unremarkable, and she had normal range of motion in her ankles, shoulders and elbows. Id. Dr. Stoll stated that Plaintiff "clinically appears to have fairly significant disease with respect to her left hip." Id. Dr. Stoll's opinion was that she would probably not be able to work at the jobs for which she had been trained. (Tr. 220). Dr. Stoll sent Plaintiff for x-rays of her left hip, which revealed a normal left hip joint, with no signs of fracture, dislocation or other acute process. (Tr. 221).

Plaintiff commenced treatment with Dr. Jacques Bonnet-Eymard, an Orthopedic Surgeon, on December 1, 2005. (Tr. 237). On that date, Plaintiff reported two to three months of bilateral knee and left hip pain. Id. Dr. Bonnet-Eymard described Plaintiff's left hip as "irritable with internal rotation and external rotation and flexion." Id. Plaintiff had full range of motion without discomfort in both knees. Id. Dr. Bonnet-Eymard reviewed x-rays which showed mild to moderate degenerative changes at the L5/S1 level. Id. He diagnosed obesity, chondromalacia of the patella, and L5 radiculopathy, further stating that "there is not much we can do for her until she loses some weight." Id. He prescribed a pain reliever, Etodolac XL. Id.

When Plaintiff returned to Dr. Bonnet-Eymard on December 21, 2005, she reported no change in her symptoms, stating that the Etodolac was not working well. (Tr. 238). However, she was no longer walking with a limp, and her hips were not irritable. Id. Dr. Bonnet-Eymard prescribed another pain reliever, Ultracet and again informed Plaintiff that he could not do much to help her until she lost weight. Id.

Plaintiff did not return to Dr. Bonnet-Eymard until February 23, 2006, reporting bilateral pain from her knees to the top of her feet. (Tr. 238). Dr. Bonnet-Eymard noted the need for knee

x-rays and prescribed Lyrica. (Tr. 239). Plaintiff still had not had the x-rays done when she returned to Dr. Bonnet-Eymard on June 8, 2006. (Tr. 241). On June 20, 2006, Plaintiff was contemplating injection therapy. Id. X-rays of both knees performed that day revealed bilateral mild osteoarthritic changes. (Tr. 288-289).

Plaintiff returned to Dr. Curran, this time at the request of her own attorney, on April 3, 2006. (Tr. 231-234). Dr. Curran did not mention Plaintiff's prior psychological evaluation, performed on June 1, 2005. (Tr. 181-184). On this visit, Plaintiff reported that she dropped out of school in the eighth grade to get married so she could get away from her mother. (Tr. 231). She reported that she had been in special education classes as a learning disabled student for English and reading. Id. After her parents' divorce, she had seen her father "about every 3 months." Id. Her first and third husbands had been physically abusive. (Tr. 231-232). Her second husband had divorced her because she could not have more children. (Tr. 232). Although she had never had a psychiatric hospitalization or been in psychotherapy, she stated that she had been depressed for most of her life and that it had worsened in the past five years. Id. Dr. Curran performed testing including the Mini-Mental State Exam, the Wide Range Achievement Test, a Brief Psychiatric Rating Scale and the Beck Depression Inventory. (Tr. 233). Dr. Curran diagnosed PTSD; major depressive disorder, recurrent, severe; and panic disorder without agoraphobia. (Tr. 234). He placed her GAF at 45. Id.

Dr. Curran also completed a Supplemental Questionnaire as to Residual Functional Capacity ("RFC"). (Tr. 235-236). In it, he indicated that Plaintiff would have severe limitations in responding appropriately to supervision, responding to customary work pressures, performing repetitive tasks and performing varied tasks. Id. He further suggested moderately severe limitations

in daily activities, responding appropriately to coworkers, and performing complex tasks, with moderate limitations in relating to other people, understanding/carrying out/remembering instructions and performing simple tasks. Id.

Plaintiff returned to Dr. Bonnet-Eymard on August 3, 2006, reporting that she had gone to the Emergency Room for foot pain. (Tr. 274). Dr. Bonnet-Eymard noted obvious tarsal tunnel syndrome and questioned whether gout was present. Id. He prescribed an ankle support and renewed a prescription for a pain reliever, Hydrocodone. Id. When Plaintiff returned on December 7, 2006, she reported losing thirty-five pounds and stated she felt good despite pain in both legs and hip pain on lying down. Id. Dr. Bonnet-Eymard gave her a program of stretching exercises and renewed her Hydrocodone prescription. Id. When Plaintiff next saw Dr. Bonnet-Eymard on January 11, 2007, he was not happy that she had only lost three pounds. (Tr. 273). He informed her that he would not renew her Hydrocodone unless she lost weight. Id.

On February 24, 2007, Dr. Bonnet-Eymard completed a Pain Questionnaire indicating that Plaintiff's osteoarthritis produced pain of such severity as to preclude the concentration and productivity needed for ongoing full-time employment, unless the job was a "sitting job." (Tr. 330). He suggested that her impairments were likely to produce good and bad days, and that she would likely be absent from work due to her impairment more than four days per month. Id. Dr. Bonnet-Eymard also completed a Physical Capacity Evaluation. (Tr. 331). In it, he indicated that Plaintiff could sit for eight hours, stand for one hour, and walk for one hour out of an eight-hour workday, and that she would need to sit and/or stand in combination every four hours. Id. He further suggested that she could frequently lift and occasionally carry up to five pounds. Id. Her ability to use all of her extremities for repetitive actions such as grasping, reaching, pushing, pulling, fine

manipulation and operating controls was intact. Id. He stated that she could never bend, squat, kneel, or crawl, and that she should have limited or no exposure to environmental hazards such as heights, machinery and extreme temperatures. Id.

X-rays of both knees performed on February 28, 2007 showed bilateral degenerative joint disease. (Tr. 328). A pelvic X-ray showed an intact bony pelvis and soft tissue within normal limits. (Tr. 329). Plaintiff saw Pat Donahue, LMHC for a Behavioral Health Screening on February 27, 2007. (Tr. 324-325). Her reported reason for referral was anger. Id. She was oriented to time, place and person, with no difficulty in concentration or memory loss. Id. She was assessed with depression. Id.

Dr. E. Lynch, DDS consultant psychologist, reviewed Plaintiff's updated records and completed a Psychiatric Review Technique form on October 21, 2005.[2] (Tr. 185-199). Dr. Lynch assessed depressive syndrome and an anxiety-related disorder resulting in mild limitations of activities of daily living and maintaining social functioning, with moderate limitations in maintaining concentration, persistence and pace. (Tr. 188, 190, 195). Dr. Lynch also completed a Mental RFC Assessment. (Tr. 200-203). In it, he assessed moderate limitations in maintaining attention and concentration for extended periods, performing activities within a schedule and maintaining attendance and punctuality, completing a normal workday and workweek at a consistent pace without interruptions, accepting instructions and responding to supervisory criticism and responding appropriately to workplace changes. (Tr. 200-201). Dr. Lynch explained that Plaintiff should be "able to concentrate/persist/pace for 2 hr. periods over an 8 hr. day [with] breaks for simple work only," and that she could "manage routine change." (Tr. 202).

[2] Dr. D. Levoy, a DDS consultant psychologist, previously completed a Psychiatric Review Technique form on February 10, 2002. (Tr. 149-161).

Dr. J.A. Jones, DDS consultant physician, reviewed Plaintiff's records and completed a Physical RFC Assessment on December 14, 2005.[3] (Tr. 222-229). Dr. Jones assessed Plaintiff with the ability to lift and/or carry ten pounds frequently and up to twenty pounds occasionally, to stand and/or walk for two hours out of an eight-hour workday and to sit for six hours out of an eight-hour workday. (Tr. 223). Dr. Jones indicated that Plaintiff's ability to use foot controls on the left was limited. Id. She could only occasionally stoop. (Tr. 224). She was further limited to only occasional grasping and twisting with both hands. (Tr. 225).

**A. The ALJ's Physical RFC Assessment is Supported by Substantial Evidence**

The ALJ decided this case adverse to Plaintiff at Step 5. He determined that Plaintiff's arthritis, diabetes, obesity and depression were "severe impairments" within the meaning of 20 C.F.R. §§ 404.1520(c) and 416.920(c). Although the ALJ recognized that the combination of Plaintiff's physical and emotional impairments impacted her ability to function, he concluded that they did "not preclude all work activity." (Tr. 21). The ALJ assessed an RFC for a "wide range of light work" with several nonexertional limitations arising out of Plaintiff's pain and depression. (Tr. 15-16). Based on this RFC and testimony of the VE, the ALJ found no disability at Step 5.

Plaintiff argues that the ALJ did not properly evaluate the medical evidence in assessing her RFC. In particular, Plaintiff challenges the ALJ's decision to favor the opinion of the State Agency Physician, Dr. Jones, (see Ex. 11F), over the opinion of a treating physician, Dr. Bonnet-Eymard (see Ex. 27F).

Dr. Jones completed his RFC assessment on December 14, 2005. (Tr. 229). Plaintiff commenced treatment with Dr. Bonnet-Eymard on December 1, 2005. (Tr. 237). The record

[3] Previous Physical RFC Assessments were completed by DDS physicians Dr. M. Colb, on February 8, 2005, and Dr. Beth Schaff, on April 20, 2005. (Tr. 141-148, 172-179).

reflects that Plaintiff treated with Dr. Bonnet-Eymard for approximately thirteen months (Tr. 273) and she saw him on eight occasions during that period. (Tr. 239-241, 273-274). On February 24, 2007, Dr. Bonnet-Eymard completed a pain questionnaire and physical capacity evaluation which essentially limited Plaintiff to sedentary work or a "sitting job." (Ex. 27F). Dr. Jones opined that Plaintiff was limited to a range of light work. (Ex. 11F).

The ALJ gave Dr. Jones' opinion "considerable weight" and Dr. Bonnet-Eymard's opinion "limited probative weight as it is not supported by clinical finding and the evidence as a whole." (Tr. 16, 20). Plaintiff argues that the ALJ violated the treating physician rule by failing to give greater weight to the opinion of her treating orthopedist (Dr. Bonnet-Eymard). In his decision, the ALJ provides a detailed explanation of the respective weights accorded to the various medical opinions offered regarding Plaintiff. (Tr. 16-21). Although Plaintiff disagrees with the ALJ's ultimate conclusions, she has not shown any error in the ALJ's evaluation of medical evidence. See Rivera-Torres v. Sec'y of Health and Human Servs., 837 F.2d 4, 5 (1st Cir. 1988) (the resolution of evidentiary conflicts is within the province of the ALJ).

Plaintiff alleges that in determining her RFC, the ALJ failed to give appropriate weight to the opinions of Dr. Bonnet-Eymard. A treating physician is generally able to provide a detailed longitudinal picture of a patient's medical impairments, and an opinion from such a source is entitled to considerable weight if it is well supported by clinical findings and not inconsistent with other substantial evidence in the record. See 20 C.F.R. § 404.1527(d). The amount of weight to which such an opinion is entitled depends in part on the length of the treating relationship and the frequency of the examinations. See 20 C.F.R. § 404.1527(d)(1). If a treating source's opinion is

not given controlling weight, the opinion must be evaluated using the enumerated factors and "good reasons" provided by the ALJ for the level of weight given. 20 C.F.R. § 404.1527(d)(2).

The ALJ provided adequate reasons for his refusal to fully credit Dr. Bonnet-Eymard's opinion and, since such reasons are supported by the record, they are entitled to deference. "[An ALJ] may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors." Castro v. Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002) (citing Shaw v. Sec'y of Health and Human Servs., 25 F.3d 1037 (1st Cir. 1994)). That is exactly what the ALJ did in this case, and there is no error.

In evaluating Dr. Bonnet-Eymard's opinions, the ALJ noted that Plaintiff only treated with him "a total of nine times since 2005,"[4] that he had not recommended surgery, and Plaintiff had not attended physical therapy. (Tr. 20). The ALJ also accurately noted that Dr. Bonnet-Eymard's opinions were inconsistent with those of other medical sources who assessed a lesser degree of physical limitation. Id. Finally, the ALJ accurately noted that the record contains no objective basis for Dr. Bonnet-Eymard's prediction that Plaintiff's impairments would result in more than four absences from work each month (an absenteeism rate of at least 25%). Id. Plaintiff counters that this prediction is supported by her complaints of pain to Dr. Bonnet-Eymard. (Document No. 10 at p. 13, n.5). However, the ALJ found Plaintiff to be less than credible (Tr. 19-21) and Plaintiff has not challenged that assessment. Furthermore, treating source opinions based primarily on subjective

[4] Dr. Bonnet-Eymard's opinions are of limited relevance, if at all, to Plaintiff's DIB claim since her date last insured is September 30, 2005. Plaintiff did not begin treating with Dr. Bonnet-Eymard until late 2005 and the opinions in issue were rendered in 2007. In contrast, Dr. Jones' opinion was rendered in late 2005 and was based on a complete review of medical records at least through the date last insured for DIB.

pain complaints may be discounted by an ALJ under these circumstances. See Reeves v. Barnhart, 263 F. Supp. 2d 154, 161 (D. Mass. 2003).

Even if the ALJ erred in rejecting Dr. Bonnet-Eymard's opinion, any such error would be harmless. Dr. Bonnet-Eymard effectively opined that Plaintiff retained the RFC for sedentary work. (Tr. 330-331). However, when the ALJ limited his hypothetical to sedentary work, the VE was still able to identify a significant number of jobs which could be performed. (Tr. 60). Thus, even if the ALJ gave greater weight to Dr. Bonnet-Eymard's opinions, a non-disability finding would still result based on a sedentary RFC and the VE's testimony.

**B. The ALJ's Mental RFC Assessment is Also Supported by Substantial Evidence**

The ALJ included several non-exertional limitations in Plaintiff's RFC based on moderate impairments in maintaining attention and concentration and in dealing appropriately with the public, coworkers and supervisors. (Tr. 16). The ALJ based his findings primarily on the opinion of Dr. Lynch, a non-examining psychologist. (Tr. 15; Ex. 8F).

Plaintiff faults the ALJ's evaluation of the opinions of Dr. Curran, a consultative psychologist. Dr. Curran first evaluated Plaintiff on June 1, 2005 at the request of State Disability Determination Services. (Tr. 181). Dr. Curran diagnosed moderate depression, moderate PTSD and a fear of heights. (Tr. 184). He assessed a GAF of 55 (moderate symptoms) and concluded that Plaintiff could follow simple instructions and get along with peers and supervisors. Id. Dr. Lynch considered this report in making his assessment. (Tr. 199). Dr. Curran evaluated Plaintiff a second time on April 3, 2006 at the request of Plaintiff's attorney. (Tr. 231). Dr. Curran again diagnosed PTSD but changed his depression diagnosis to severe and added a diagnosis of panic disorder and

fear of enclosed spaces and thunderstorms. (Tr. 234). His GAF assessment decreased to 45 (serious symptoms). Id.

In his second 2006 report, Dr. Curran does not reference the existence of the 2005 evaluation, and it is unclear if Dr. Curran was even aware of it. Dr. Curran found Plaintiff to be a "reliable historian." (Tr. 231). Yet, as accurately noted by the ALJ, there are "a number of significant inconsistents in statements made by [Plaintiff] to treating sources." (Tr. 21). The ALJ noted that "[t]he most obvious of these occur in statements made by [Plaintiff] in two evaluations conducted with Dr. Curran":

> She told Dr. Curran in September 2005 that she had been in regular classes and quit school because she didn't like school; then stated in April 2006 that she had been in special education classes, and quit school to get married and get away from her mother. She stated in September 2005 that after her parents divorced she very seldom saw her father, but in April 2006 stated she saw him every 3 months after the divorce. In September 2005 denied any sexual abuse, and in April 2006, stated her step father sexually abused her from age 8 to 12 or 13 years old. In September 2005 she stated she was physically abused by all three ex-husbands, and in April 2006 physically abused by first and third husband. The claimant reported being depressed for approximately two years in September 2005, then in April 2006 stated she had been depressed for most of her life, as far back as she could remember. In September 2005 she stated that the second marriage ended because the husband was an alcoholic and beat her; but then in April 2006 reported he left her because she couldn't have children. Dr. Curran reported in September 2005 that the claimant smoked marijuana when she was younger, but in April 2006 noted the claimant denied ever using any illicit drugs. (Exhibits 7F, 12F).

(Tr. 21).

It is apparent that the ALJ did not find Plaintiff to be a credible historian and thus he would necessarily question the factual underpinnings for Dr. Curran's opinions. Neither Plaintiff's attorney nor Dr. Curran (in his second report) attempt to explain the inconsistencies between the histories and

diagnoses in the two reports. If Dr. Curran's reports are taken out of the equation, there are very few medical records regarding Plaintiff's mental impairments including a reference to "depression not severe" by her primary care physician and a prescription for Zoloft. (Tr. 161).

Plaintiff has simply shown no error in the ALJ's evaluation of Dr. Curran's reports or his reliance on Dr. Lynch's report. In fact, the ALJ's assessment of moderate limitations in maintaining attention and concentration and in dealing appropriately with others is a generous assessment of the record. There is no basis for Plaintiff's suggestion that the ALJ was required to assess moderately severe restrictions based on the record in this case.

**VI. CONCLUSION**

For the reasons stated above, I order that the Commissioner's Motion for Order Affirming the Decision of the Commissioner (Document No. 11) be GRANTED and that Plaintiff's Motion to Reverse the Decision of the Commissioner (Document No. 10) be DENIED. Final judgment shall enter in favor of Defendant.

/s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
August 14, 2008